FALSTAFF BREWING CORPORATION, a Delaware Corporation, Plaintiffs,

v.

NEW YORK LIFE INSURANCE COMPANY, a New York Corporation, and The Mutual Life Insurance Company of New York, a New York Corporation, Defendants.

No. C 75–1560 CFP.

United States District Court,
N. D. California.

March 3, 1978.

Sullivan, Jones & Archer, San Francisco, Cal. (Richard J. Archer and Linda Ho, San Francisco, Cal., of counsel) and Boone, Schatzel, Hamrick & Knudsen, San Francisco, Cal. (Theodore W. Rosenak, San Francisco, Cal., of counsel) for plaintiff.

Morrison & Foerster, San Francisco, Cal. (Robert D. Raven, William Alsup, Kathleen V. Fisher and Ronald G. Carr, San Francisco, Cal., of counsel) for defendant, New York Life Insurance Company.

Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal. (Craig H. Casebeer, San Francisco, Cal., of counsel) for defendant, the Mutual Life Insurance Company of New York.

## MEMORANDUM OPINION GRANTING SUMMARY JUDGMENT AND DENYING MOTION TO AMEND

POOLE, District Judge.

This is a declaratory judgment action in which plaintiff Falstaff seeks a determination as to its obligations under several loan agreements with defendants New York Life Insurance Co. (NYL) and Mutual Insurance Co. of New York (MONY). The defendants have counterclaimed for the full amounts owing on the loans, alleging that Falstaff was in default. They now move for summary judgment on both Falstaff's declaratory action and their counterclaim. Falstaff seeks to amend its answer to defendants' counterclaim by adding as a new defense counterclaimants' failure under California State law to exhaust certain security prior to suing at law for the amount alleged to be due. For the reasons set forth below the Court grants the defendants' motion for summary judgment and denies Falstaff's motion to amend its answer to the counterclaim.

### I. *Background*

Between 1961 and 1972 NYL and MONY, together with four national banks, made loans to Falstaff of more than 41 million dollars. The loans by the banks were for a much shorter term and at a higher rate of interest than the NYL and MONY loans. The loans were unsecured but contained protective covenants under which Falstaff agreed to maintain certain levels of assets or working capital; agreed, with certain exceptions, not to encumber its assets; and agreed, again with certain exceptions, not to increase its debt. Violation of any of these covenants would give creditors the right to accelerate the loan obligations, making them immediately payable in full.

In 1972, 1973 and 1974 Falstaff suffered serious financial losses and was in precarious financial position, bordering on bankruptcy. At numerous times in 1973 Falstaff asked for, and received, from the lenders waivers of the loan agreements because of its worsening financial situation. In return for these waivers Falstaff gave the lenders interests in various security, including real property in California.

In a further response to this financial crisis, the six lenders held a series of meetings which culminated on January 20, 1975 in their execution of a Collateral Agency Agreement. The lenders' ostensible intent in entering this agreement was to keep Falstaff from bankruptcy while at the same time preserving their interests. The only part of the Collateral Agency Agreement which is involved here is Section 21, which provides for the pro rata sharing among the lenders of payments received from Falstaff:

"*Application of Payments.* Each Lender agrees with each other Lender that in the event it receives any payment of any kind

or character on or in respect of its Notes, whether before or after the occurrence of an Event of Default or an event which, with the lapse of time, the giving of notice or both would constitute such an Event of Default, and whether such payment is received as the proceeds of Collateral, through set off of deposit balances, or otherwise (excluding from the foregoing, however, payments received by such Lender in accordance with the repayment terms of its Notes, other than pursuant to any acceleration thereof, prior to the occurrence of an Event of Default) it will forthwith transmit to the other Lenders an amount equal to their pro rata proportion of such payment determined in accordance with the aggregate principal amount of the Notes outstanding at such time. All such payments received by any Lender after the occurrence of an Event of Default, and all amounts received by the Collateral Agent after the occurrence of an Event of Default as the proceeds of Collateral shall [after collection expenses are deducted, be distributed ratably]."

Only the lenders signed the Collateral Agency Agreement. Whether Falstaff later became a party to the Agreement is disputed. However, for the purposes of this motion, NYL and MONY concede that Falstaff was not a party to the Agreement.

During this time Mr. Paul Kalmanovitz was endeavoring to take over Falstaff. On March 10, 1975 an agreement was signed between Kalmanovitz and Falstaff, subject to stockholder approval at their April 25, 1975 meeting, whereby Kalmanovitz would gain control in return for his advancing 10 million dollars and committing his personal guarantee with respect to a number of trade creditor accounts. The shareholders voted to approve the plan at the scheduled meeting. In order to save Falstaff from bankruptcy Kalmanovitz planned, and the March 10 agreement provided, that the 10 million dollars would be devoted to prepayment of the bank loans and thus would eliminate those high interest payments from Falstaff's debt service.

Although it had been necessary for Falstaff to request waivers from the covenants in the loan agreements, at no time did it fail to make timely payments of interest or principal. NYL and MONY insist that the covenants (which required that Falstaff not encumber its assets; keep a certain level of working capital; and not enlarge its debt) were designed to provide assurance that future payments would be made. At any rate, while the Kalmanovitz negotiations were still in progress, the waivers of the covenants were to expire on March 15, 1975, and Falstaff requested an extension until April 30, 1975 (five days after the shareholders were to vote on the Kalmanovitz agreement). NYL and MONY agreed to this extension but only on the condition that there be included a pro rata payment provision similar to that in the Collateral Agency Agreement. On behalf of Falstaff's Board, Healy, who was vice president, secretary and treasurer, executed the letter agreements on March 24 and 25, acquiescing in the pro rata provisions demanded by NYL and MONY.

The conditions contained in paragraph 4 of the letters, which are virtually identical, read:

"4. Any payment to one or more parties to the Collateral Agency Agreement without equally proportionate payment to all of the parties thereto in connection with the reduction of, retirement or purchase of any outstanding indebtedness of Falstaff and any failure to comply with and perform all of the terms and conditions of this Waiver by Falstaff or any third party shall be deemed to constitute an additional event of Default under the Notes and entitle New York Life without further notice or demand to accelerate the maturity of all of the notes held by it and to institute proceedings for their immediate collection, including reasonable attorneys fees and costs, all as of March 15, 1975."

Falstaff now denies that Healy was authorized to sign. It claims that he had no apparent authority to sign, or, alternatively, that the committments should not be held

binding because Falstaff was coerced into signing them.

On June 30, 1975 Falstaff prepaid to the four bank lenders the full amount of their loans, without making proportional payments to NYL and MONY. In its original complaint Falstaff seemed to concede that such payment to NYL and MONY was required by the terms of the letter agreements which therefore were, it said, illegal under the antitrust laws. On this motion, however, Falstaff argues that it was not prohibited by those terms from prepaying the bank loans without doing so pro rata to NYL and MONY. The principal controversy therefore is whether this prepayment to the banks constituted default by Falstaff, or whether the March 24 and 25 agreements imposed illegal restraints.

Falstaff actively encouraged and attempted to persuade the banks not to distribute any of the payment to NYL and MONY. NYL and MONY then sued the banks to obtain their proportional shares. This litigation ended in a settlement in November 1976 by the terms of which NYL and MONY were paid their pro rata shares of the Falstaff payment. On July 24, 1975, apprehensive that NYL and MONY intended to claim default, Falstaff filed this action for declaratory relief seeking a determination of its obligations under the Collateral Agency Agreement and the letter agreements of March 24 and 25. The material contentions made by Falstaff are:

1. The Collateral Agency Agreement and Letter Agreements of March 24 and 25 violate § 1 of the Sherman Antitrust Act.

2. Falstaff was not a party to and hence not bound by the Collateral Agency Agreement.

3. Those Agreements constitute an interference with Falstaff's contractual relations.

4. Healy was not authorized to sign the Letter Agreements, had no apparent authority to sign them, and was coerced into signing them.

5. Defendants waived performance by Falstaff of the conditions of the agreements when the banks accepted the prepayment.

The day after the Falstaff complaint was filed in this Court, NYL and MONY served notice on Falstaff that it was in default on the loans on account of, among other things, having made the prepayment to the banks. Immediate payment in full was demanded.

NYL answered and by counterclaims sought a judgment that Falstaff was in default and was obligated to pay in full the amount due. It also sought 10 million dollars in punitive damages on account of the alleged wrongful attempt by Falstaff to keep the banks from sharing the sums which had been prepaid to them. MONY separately answered and filed counterclaims seeking adjudications that Falstaff be found in default and be ordered to pay the full amount of its outstanding balance. The account balances due NYL and MONY on the loans are respectively 6.4 million dollars and 3.6 million dollars.

## II. NYL and MONY's Motion for Summary Judgment

NYL has brought a motion, in which MONY joins, for summary judgment. The motion seeks three determinations which, it is asserted, will entirely dispose of this case:

1. That the requirement that Falstaff's prepayments to the lenders be made pro rata was not prohibited by the Sherman Act.

2. That the pro rata requirement was not prohibited by state law.

3. That NYL and MONY are entitled to full payment on their loans (granting their counterclaim).

Before discussing these assertions the Court will address Falstaff's contention, advanced for the first time in its brief in opposition to the motions for summary judgment. That contention is that the Collateral Agency Agreement and the March 24 and 25 agreements should be interpreted so as not to prevent prepayments at all.

### A. The scope of the March 24 and 25 agreements

In its brief Falstaff offers the completely new theory that:

"* * * the letter [agreement] is ambiguous and ... when properly understood applies only to distribution upon liquidation and not to payments or prepayments." Br., p. 15.

However, on their face those agreements appear to preclude much doubt as to their interpretation. The language of paragraph 4 reads in substantial part:

"4. Any payment to one or more parties to the Collateral Agency Agreement without equally proportionate payment to all of the parties thereto in connection with the reduction of, retirement or purchase of any outstanding indebtedness of Falstaff * * * shall be deemed to constitute an additional event of default under the notes * * *."

During hearings on this motion Falstaff's counsel asserted that there was in existence evidence in certain depositions which would establish that although the intendment of the above language seems to be clear, it was the understanding of the parties among themselves that the limitations in the agreement only applied to payments made by Falstaff upon liquidation. There was no evidentiary basis for this proposition set forth in the original papers and so the Court afforded Falstaff an opportunity for submission of such evidence. Upon reviewing that which has been tendered the Court finds still no showing that the parties intended anything inconsistent with the plain language of the provisions set forth above. Falstaff's new interpretation of those agreements is therefore without support in the record. Nor is there evidence to support Falstaff's additional contention that NYL and MONY had waived the benefit of the March agreement by themselves accepting prepayments from Falstaff without making a pro rata distribution to the other lenders. The Court finds it unnecessary to decide whether the pro rata requirement applied to all manner of payments (although the language would seem so to indicate), for all that is presented to us here is the question of coverage of prepayments.

In conclusion, the Court is of the opinion that the agreements between Falstaff and NYL and MONY required that any prepayments made to any of the lenders by Falstaff be prorated.

B. *Application of the Sherman Act to the pro rata requirements*

Section 1 of the Sherman Act (Title 15 U.S.C. § 1, *et seq.*) prohibits all agreements in restraint of trade or commerce. The issue here is whether the pro rata agreement regarding prepayments restrained trade. If so, a subsidiary issue arises whether such restraint constituted price-fixing and was therefore a *per se* violation of the Sherman Act.

■ Falstaff asserts that the letter agreements restrained trade and amounted to price-fixing. The effect of the restrictions, it contends, was to prevent it from paying off the high interest bank loans before discharging the lower interest loans due to NYL and MONY. This in turn had the effect of "fixing" Falstaff's interest rates for the total indebtedness. This argument has little substance. As NYL and MONY point out, they were not competing with the banks or other institutions to offer or to supply Falstaff with *more* credit, but were attempting to secure that credit which they had already extended, the terms of which had already been negotiated. This is in fact the very opposite of price-fixing. The Court concludes that the letter agreements did not constitute price-fixing as charged by Falstaff.

An agreement which does not fix prices may nonetheless restrain trade. In this case however, if there existed any restraint it was a reasonable one under the circumstances. NYL and MONY characterized the agreements as "workout arrangements," which are long-standing and accepted means of avoiding bankruptcy. For such arrangements to succeed all the lenders must mutually agree to forbearance and no major lender will commit to such forbearance unless all of them do. NYL and MONY make a convincing argument that it is essential that prepayments be shared in order that no single creditor or group of creditors receive preferential prepayments

to the detriment of the other creditors. The parties cite no compelling case authority on workout arrangements, but the Court is persuaded that they constitute a long accepted method of avoiding bankruptcy; and that as such they are reasonable and not violative of the antitrust laws. It concludes, therefore, that the letter agreements involved here did not violate the laws in restraint of trade.

### C. *Authorization for execution of the pro rata agreements*

■ Falstaff argues that it should not be bound by the letter agreements because Healy, who signed them, had neither actual nor apparent authority, and even if he had such authority, his (i. e., Falstaff's) consent and signature were procured by duress. As set forth above, Healy was a top officer of the company, holding the positions of vice president, treasurer and secretary. In support of its contention that he did not have actual authority, Falstaff points out that the minutes of the board meetings at which the letter agreements were considered contained no indication that Healy was instructed to sign the letters on behalf of the company, or that they were approved by the board. The minutes are in fact silent as to these matters. But, the record as a whole supports the conclusion that Healy had general authority to approve such waiver agreements and that he had done so in the past. While there is no ready explanation for the condition of the minutes, this is not an unknown situation. Whatever the answer, there are positive declarations in deposition testimony by Healy and by Gutting (then Chairman of Falstaff) that Healy was in fact authorized, and that the Board did in fact approve the agreements. In the face of such a showing, the Court concludes that Healy was authorized to sign the agreements. It is, therefore, unnecessary to consider the assertion that he lacked apparent authority.

The claim that Healy's signature was obtained under duress raises legal and factual issues, and since that claim is before us based on diversity jurisdiction, the applicable law must be determined in accordance with the choice of law rules of the state of California. The NYL and MONY loan agreements specify that they are to be governed by the law of New York. California would thus apply the New York law and Falstaff agrees that this is appropriate.

■ The New York law on duress requires as an essential element that there be an unjustified threat. Thus, in *Oleet v. Pennsylvania Exchange Bank*, 285 A.D. 411, 137 N.Y.S.2d 779, 783 (1955) one of the leading cases of that state, the standards for the tort of economic duress are described as follows:

> "The vice arises only when he employs extortive measures, or when, lacking good faith, he makes improper demands. This occurs when his demands are made with respect to matters in which he has no rightful claim,—or a doubtful claim,— or a claim insignificant when contrasted with the demands."

The "threats" attributed to NYL and MONY are simply that in March 1975 they expressed their intention to declare Falstaff in default under its loan agreements unless the letter agreements were executed. But, these were neither "doubtful claims" nor improper demands as set forth in *Oleet, supra.* The charge of duress fails.

### D. *The Counterclaims*

The Court has concluded that the March 24 and 25 letter agreements prohibited Falstaff from making prepayments to the lenders without a pro rata distribution of such payments, and that these agreements are valid. Falstaff did make such prepayments without distributing them pro rata to the other lenders. This constituted an act of default under those agreements, and is the basis for the motions for summary judgment on NYL's and MONY's counterclaims. In opposition Falstaff interposes the argument that by terms of the original Collateral Agency Agreement, the lenders were agents of each other and were bound to distribute to each other any payment received from Falstaff; that such distribution was made in connection with settlement of NYL's and MONY's lawsuit against the banks; and that by accepting such payment NYL and MONY have waived any default

of Falstaff and are estopped from raising that claim.

In evaluating Falstaff's equitable cure argument, the Court looks to New York law. Although New York does recognize an equitable cure as a defense to a default action, *e. g., Stream v. CBK Agronomics, Inc.*, 361 N.Y.S.2d 110, 79 Misc.2d 607 (Sup.Ct.1974), *modified* as to attorneys' fees, 368 N.Y.S.2d 20, 48 App.Div.2d 637 (1975), the facts here do not support application of that doctrine. Generally, to qualify for the protection afforded by this doctrine requires that the debtor have tendered full payment before a notice of default is received as well as have clean hands. *Armstrong v. Rogdon Holding Corp.*, 247 N.Y.S. 682, 139 Misc. 549 (Sup.Ct.1930), *aff'd.*, 254 N.Y.S. 950, 234 App.Div. 854 (1931). In the present case, Falstaff deliberately violated the terms of the letter agreements and never even attempted to cure the default. NYL and MONY received payment from the other lenders, not Falstaff, and that was only in response to a suit they had brought against the banks. In fact, Falstaff attempted to frustrate NYL and MONY's efforts to collect from the other lenders. Therefore, the Court concludes that the equitable cure defense is not available to Falstaff.

Falstaff further argues that NYL and MONY's acceptance of the payment from the banks pursuant to the settlement agreement constituted a waiver of the default. However, the terms of the settlement agreement explicitly state that it is not a waiver of this default action. Therefore, Falstaff's waiver argument fails. *E. g., Werking v. Amity Estates*, 2 N.Y.2d 43, 155 N.Y.S.2d 633, 137 N.E.2d 321 (1956).

The Court therefore concludes that Falstaff is in default on its loans from NYL and MONY, and that such default was not cured by the fact that NYL and MONY received a portion of the prepayment from the other lenders.

III. *Falstaff's Motion to Amend its Answer to NYL and MONY's Counterclaim*

Falstaff now seeks to amend its answer to NYL and MONY's counterclaims in order to assert an affirmative defense under Section 726 of the California Code of Civil Procedure, which provides in relevant part:

"There can be but one form of action for the recovery of any debt, or the enforcement of any right secured by mortgage upon real or personal property, which action must be in accordance with the provisions of this chapter."

NYL and MONY have sued for a personal judgment against Falstaff. Although the loans were secured by mortgages on California real property, neither NYL or MONY has instituted foreclosure proceedings against that property. In these circumstances Section 726 allows a debtor to insist through an affirmative defense that the lender proceed against it and the security in one action so that a personal deficiency judgment is entered only after the security is foreclosed upon in the judicial proceeding. *Walker v. Community Bank*, 10 Cal.3d 729, 734, 111 Cal.Rptr. 897, 518 P.2d 329 (1974). If the debtor does not assert Section 726 as an affirmative defense the lender loses the security interest in the California real property. *Id.* at 734, 111 Cal. Rptr. at 900, 518 P.2d at 332.

The issue before the Court is whether Falstaff should be allowed to amend its answer to NYL and MONY's counterclaim at this late date. The counterclaim was filed more than two years ago and the defense of Section 726 has been available during the entire period. Falstaff has offered *no reason* why it delayed two years in asserting it. This case was set for trial. Falstaff's motion to amend was only filed after NYL and MONY had noticed the present motion for summary judgment. It was a delaying tactic. In these circumstances courts have not hesitated to deny leave to amend. For example, in *Kirby v. P.R. Mallory & Co., Inc.*, 489 F.2d 904 (7th Cir. 1973), *cert. denied*, 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1973), the court upheld the district court's refusal to allow

the plaintiff to amend his antitrust claim by adding a claim under the Clayton Act:

"... Kirby did not seek to file his motion *until Mallory's motion for summary judgment was reset for oral argument,* when Kirby anticipated foreclosure of his Robinson-Patman claim. It is clearly unfair to Mallory to permit Kirby to remain mute for this period and then to bolster his pleadings to prevent an anticipated adverse judgment."

*Id.* at 912. The court noted that plaintiff was well aware of the necessary facts for over two years. *Id. Accord: Burke v. Green,* 422 F.Supp. 350 (E.D.Pa.1976).

The Court concludes that Falstaff's motion to amend its answer to NYL and MONY's counterclaims is untimely.

For the reasons set forth above, the Court HEREBY ORDERS that:

1. NYL and MONY's motion for summary judgment on Falstaff's complaint be granted;

2. NYL and MONY's motion for summary judgment on their counterclaim against Falstaff seeking a default judgment is granted;

3. Falstaff's motion to amend its answer to assert an affirmative defense under Section 726 of the California Code of Civil Procedure is denied.