SHARON STEEL CORPORATION,
Plaintiff,

v.

The CHASE MANHATTAN BANK, N.A.,
Manufacturers Hanover Trust Company
and United States Trust Company of
New York, Defendants.

MANUFACTURERS HANOVER TRUST
COMPANY, Third-Party Plaintiff,

v.

UV INDUSTRIES, INC., Third-Party
Defendant.

CONNECTICUT MUTUAL LIFE
INSURANCE COMPANY, et al.,
Intervenors,

v.

SHARON STEEL CORPORATION,
Plaintiff,

and

UV Industries, Inc., Third-Party
Defendant.

UNION PLANTERS NATIONAL BANK
OF MEMPHIS, as Trustee, Plaintiff,

v.

UV INDUSTRIES, INC. and David Finkel-
stein, Arthur R. Gralla, Martin Horwitz,
Edwin Jacobson, Theodore W. Kheel,
and Paul Kolton, as Trustees of the UV
Industries, Inc. Liquidating Trust, De-
fendants,

and

Sharon Steel Corporation, Defendant.

Nos. 79 Civ. 6996 (HFW), 80 Civ.
5341 (HFW).

United States District Court,
S. D. New York.

May 11, 1981.

Shearman & Sterling, New York City, for Sharon Steel Corp.; Stephen A. Oxman, Francis X. Markey, Robert J. Hausen, William J. F. Roll, III, New York City, of counsel.

Shea & Gould, New York City, for UV Industries, Inc.; Bruce A. Hecker, Ronald H. Alenstein, Ronald D. Lefton, New York City, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Chase Manhattan Bank; Robert C. Myers, John F. Collins, Deborah B. Zwany, New York City, of counsel.

Kelley, Drye & Warren, New York City, for Manufacturers Hanover Trust Co.; Robert Ehrenbard, Edward Roberts, III, William A. Krohley, Paul Lubetkin, New York City, of counsel.

Rosenman Colin Freund Lewis & Cohen, New York City, for Connecticut Mutual Life Insurance Co., et al., Intervenors; Frank H. Wohl, Nadia C. Adler, Steven F. Miller, Lee A. Barkan, Donald M. Spector, Daniel R. Benson, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for Union Planters Nat. Bank of Memphis; J. Peter Coll, Jr., and Clarence Otis, Jr., New York City, of counsel.

## OPINION

WERKER, District Judge.

Plaintiff, Sharon Steel Corporation ("Sharon"), commenced this action against defendants, The Chase Manhattan Bank, N.A. ("Chase"), Manufacturers Hanover Trust Company ("Manufacturers"), and United States Trust Company of New York ("U.S. Trust").[1] Manufacturers impleaded

---

1. All claims and counterclaims pending between and among Sharon, UV and U.S. Trust were dismissed with prejudice pursuant to stipulation of the parties on May 11, 1981. Be-

UV Industries as a third-party defendant, and the holders of certain UV debentures (the "Intervenors") intervened, asserting claims against both Sharon and UV. Union Planters National Bank of Memphis ("Union Planters") subsequently commenced a separate action against UV, the Trustees of the UV Industries, Inc. Liquidating Trust, and Sharon Steel Corporation. The Union Planters suit has been consolidated with the main action for all purposes.

This action having been tried before a jury on April 21–24, April 27–30, and May 4–6, 1981, and plaintiff having completed the presentation of its evidence, Chase, Manufacturers, the Intervenors and Union Planters have moved for a directed verdict pursuant to Fed.R.Civ.P. 50(a), on the ground that plaintiff has failed to establish a prima facie case as to any of its eight causes of action and that all its claims can be decided as a matter of law. Without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, I find that there is but one conclusion that can be reached with respect to each of plaintiff's claims. Accordingly, I grant the motion for a directed verdict as a matter of law and dismiss the complaint. In so ruling, I have viewed the evidence in plaintiff's favor to the extent possible and have given the plaintiff the benefit of all inferences which reasonably could be drawn from the evidence. *See Lopez v. A/S D/S Svendborg*, 581 F.2d 319, 321 (2d Cir. 1978). I now enter this opinion in support of this disposition. The relevant facts follow.

Between 1965 and 1977, UV borrowed certain sums of money pursuant to five separate indentures (the "Indentures"). Two indentures involved Chase as trustee, and the remaining three involved Manufacturers, Union Planters and U.S. Trust as trustees.

The Manufacturers Indenture was issued pursuant to an indenture dated April 15, 1977. Under this indenture, UV borrowed approximately $75,000,000 by issuing 8⅞%

debentures due 1982–1998. Approximately $66,775,000 principal amount of these debentures is still outstanding.

The U.S. Trust Indenture was issued pursuant to an indenture dated as of April 15, 1977. Under this indenture, UV borrowed approximately $25,000,000 by issuing 9¼% senior subordinated notes due 1987. Approximately $15,035,000 principal amount of these notes is still outstanding.

The first Chase Indenture was issued pursuant to an indenture dated as of September 1, 1965. Under this indenture, UV borrowed approximately $23,000,000 by issuing 5⅞% subordinated debentures due 1979–1995. Approximately $13,669,900 principal amount of these debentures is still outstanding.

The second Chase Indenture was issued pursuant to an indenture dated as of December 1, 1968. Under this indenture, the City of Port Huron, Michigan borrowed approximately $22,000,000 by issuing Industrial Development Revenue Bonds which bear interest at the rate of 6¼% due 1993. Approximately $16,550,000 principal amount of these debentures is still outstanding.

The Union Planters Indenture was issued pursuant to an indenture dated as of November 12, 1968. Under this indenture, The County of Itawamba, Mississippi borrowed approximately $13,000,000 by issuing Industrial Revenue Bonds due 1993. Approximately $10,270,000 principal amount of the bonds is still outstanding.

The municipalities that were parties to the second Chase Indenture and the Union Planters Indenture issued the bonds for the purpose of acquiring and constructing premises which were to be and were leased to Mueller Brass Company ("Mueller"), a wholly-owned subsidiary of UV. Mueller's rent payments to each of the municipalities were to be used to pay the principal and interest on the bonds. UV executed Lease Guaranty Agreements (the "Lease Guaranties"), in connection with these leases, guar-

---

cause the caption of the action has not yet been amended to reflect this, U.S. Trust must continue as a named defendant. Despite the settle-

ment, reference to U.S. Trust in the course of this opinion was necessary for full development of the facts.

anteeing unconditionally the payment of all amounts due under the leases.

Each indenture provides in essence that in the event that UV merges or consolidates with another corporation or sells "all or substantially all" of its assets to another corporation, the successor corporation is entitled to succeed to UV's rights and obligations under the indenture. In addition, the Lease Guaranties provide that in the event of a sale of "all or substantially all" of UV's property to another corporation, the purchaser must assume in writing all of UV's obligations thereunder.

On December 19, 1978, UV publicly announced that it planned to sell one of its wholly-owned subsidiaries, Federal Pacific Electric Company ("Federal") and on January 19, 1979, UV publicly announced that it planned to liquidate. On February 20, 1979, UV distributed a proxy statement to all UV stockholders recommending approval of the sale of Federal to a subsidiary of Reliance Electric Company ("Reliance") for $345,-000,000. The proxy statement also set forth and recommended a Plan of Liquidation and Dissolution (the "Liquidation Plan"), pursuant to which the assets of UV were to be sold over a 12-month period, with the proceeds or unsold assets to be distributed to shareholders after payment of or provision for UV's obligations. The Liquidation Plan required "that at all times there be retained an amount of cash and other assets which the Board deems necessary to pay, or provide for the payment of, all of the liabilities, claims and other obligations ..." of UV. The proxy statement also stated that if both the sale of Federal and the Liquidation Plan were approved, there would be an initial liquidating distribution of $18 per share to the holders of UV common stock. On February 21, 1979, UV announced that it had scheduled a special meeting for March 26, 1979 at which time its shareholders' would vote on the plan to sell Federal as well as the Liquidation Plan.

At the special meeting on March 26, UV's shareholders approved the sale of Federal and the adoption of the Liquidation Plan. Thereupon, UV entered into a plan of voluntary liquidation and dissolution. The following day, UV, a Maine corporation, filed its Statement of Intent to Dissolve with the State of Maine.

On March 29, 1979, UV sold Federal to a subsidiary of Reliance Electric Company for $345,000,000 in cash. On April 9, 1979, UV announced that it would make the previously planned liquidating distribution of $18 per share to its common stockholders on April 30, 1979.

Although the Trustees had been aware of UV's plan to sell Federal and make the liquidating distribution since at least February 20, 1979, they made no attempt to block the planned distribution until April 26, 1979, the eve of the last business day before the distribution was to occur. On April 26, representatives of Chase, Manufacturers and U.S. Trust met with UV representatives. At least one of the banks threatened to commence litigation to enjoin the distribution unless UV immediately paid the bondholders whom the banks as indenture trustees represented.

The outcome of the meeting was embodied in a document entitled "Agreement for Treatment of Certain Obligations of UV Industries, Inc." (the "April Document"), dated April 27, 1979, which provided that UV would deposit with certain banks an aggregate amount of $155,000,000 in cash or cash equivalents to cover all its public indebtedness. The April Document also provided that within 90 days, UV would present to the indenture trustees a proposal for the payment of its Indebtedness and for satisfaction and discharge of UV's obligations under the Indentures. The April Document further stated that UV and the trustees entered into the April Document for good and valuable consideration, and in executing the April Document, the signatory Indenture Trustees agreed not to seek a court injunction against the $18 per share liquidating distribution. UV thereafter deposited the $155,000,000 in the special fund and proceeded to distribute a total of about $274,000,000 to its stockholders on April 30, 1979.

On July 23, 1979, UV announced that it had entered into an agreement for the sale of most of its oil and gas properties to Tenneco Oil Company ("Tenneco") for 135,-000,000 cash. This sale was consummated on October 2, 1979.

On November 26, 1979, Sharon and UV entered into an agreement entitled "Agreement for Purchase of Assets" ("Purchase Agreement") and "Instrument of Assumption of Liabilities" ("Assumption Instrument"). Under these agreements Sharon agreed to buy UV's assets and assume UV's liabilities.

Under the Purchase Agreement, all of the assets owned by UV on November 26, 1979 were purchased by Sharon. Under the Assumption Instrument, Sharon assumed all of UV's liabilities, with exceptions not relevant here, including UV's liabilities under the Indentures. Before November 26, 1979, UV or its subsidiary Mueller Brass timely made all payments of semi-annual interest, all sinking fund payments and all rent payments required by the Indentures, leases or Lease Guaranties.

In accordance with the successor obligor sections of the Indentures providing for the execution and delivery to the defendant trustees of Supplemental Indentures upon the sale of all or substantially all of UV's assets to another corporation, Sharon delivered on December 6, 1979 to each of the trustees a First Supplemental Indenture executed by Sharon and UV, along with other documents required by the Indentures. The defendants have refused to execute the supplemental indentures, but Sharon nevertheless has continued to make all payments of principal and interest required under the Indentures. On December 31, 1979, Sharon delivered an Assumption of Lease Guaranty to Chase and Union Planters but they also have refused to sign them.

By letters dated December 24, 1979 Chase, U.S. Trust and Manufacturers delivered to Sharon and UV virtually identical notices stating that UV's sale of assets to

Sharon constituted a default under the Indentures. None of the notices referred to any event other than the sale of UV's assets to Sharon as a basis for default. On the same day, Chase and U.S. Trust commenced virtually identical actions against Sharon and UV in New York Supreme Court. Manufacturers subsequently filed a similar suit against both Sharon and UV in New York Supreme Court on March 21, 1980. Union Planters issued a notice of default on July 24, 1980, and commenced suit in this court on September 19, 1980.

The amended complaint sets forth eight [2] causes of action. In essence, five claims are presented. The first and second are that the April Document is of no force and effect because UV was coerced into entering into the agreement and because there was a failure of consideration flowing to UV. Sharon's third claim is that when it purchased all UV's assets and assumed all UV's liabilities, the April Document expired and became inapplicable because it was never intended to apply and cannot, as a matter of law apply to a successor corporation as defined in the Indentures. Sharon's fourth claim is that Manufacturers and Chase have engaged in an unlawful conspiracy in restraint of interstate trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Sharon also has asserted these claims against the Intervenors and Union Planters, arguing that Manufacturers was the Intervenor's agent and that Manufacturers, Chase and U.S. Trust acted as agents for Union Planters. Finally, Sharon claims that Chase and Manufacturers with respect to the 5⅝% and 8⅞% debentures respectively have improperly, wrongfully and unreasonably (a) refused to execute supplemental indentures, (b) issued notices of default, and (c) seek immediate payment of the debentures. Sharon contends that as a consequence of these wrongful acts, it has been deprived of an agreement to which it is lawfully entitled. Sharon asserts against the Intervenors the same claim asserted against Manu-

---

**2.** The amended complaint originally contained nine causes of action. Sharon withdrew this claim at the commencement of trial.

facturers on the basis of the alleged agency relationship between Manufacturers and the Intervenors. In addition, Sharon contends that Chase and Union Planters have wrongfully and unreasonably (a) issued notices of default under their respective lease guaranties and (b) seek immediate repayment of the bonds issued pursuant to the City of Port Huron and County of Itawamba Indentures.

### The Coercion Claim

■ Sharon contends that UV was coerced into executing the April Document and that therefore, the document is null, void, and unenforceable against Sharon and UV. The heart of plaintiff's position with respect to this claim is that the defendants, although they had known about the planned liquidating distribution scheduled for April 30, 1979 for over two months, waited until the eve of the distribution, and then improperly threatened to impede the distribution unless UV agreed to make certain undertakings with respect to its public debt. According to Sharon, Chase, U.S. Trust, and Manufacturers jointly pursued this conduct despite the statement in UV's Liquidation Plan that it would retain sufficient cash to pay or make provision for its debts, as required by Maine law at all times during the term of the Plan.

The modern doctrine of economic duress . . . [e]ven in its furthest extension . . . has not been applied to a threat of process or suit, not otherwise oppressive, limited to the subject matter of the agreement, attacked for duress . . . . Nor should the rule be extended to threats to employ process or exercise rights, not otherwise disproportionate or clearly oppressive, available to the promisee with respect to the subject matter proper. It would make little sense to inhibit the promisee from claiming or enforcing his just due. The vice arises only when he employs extortive measures, or when lacking good faith, he makes improper demands. This occurs when his demands are made with respect to matters in which he has no rightful claim,—or a doubtful claim,—or a claim insignificant when contrasted with the demands.

*Oleet v. Pennsylvania Exchange Bank*, 285 App.Div. 411, 415, 137 N.Y.S.2d 779, 783 (1st Dep't 1955); *see Gerstein v. 532 Broad Hollow Road Co.*, 75 App.Div.2d 292, 429 N.Y. S.2d 195 (1st Dep't 1980).

In this case, it cannot be said that the threat of litigation to block the liquidating distribution was made with respect to matters concerning which the trustees had no rightful claim or a doubtful claim. UV had entered upon a Plan of Liquidation and Dissolution, triggering the provisions of Maine law.

The relevant Maine statute provides:

After paying or adequately providing for the payment of all its obligations, the corporation shall distribute the remainder of its assets, either in cash or in kind, among its shareholders according to their respective rights and interests.

13A Me.Rev.Stat. § 1106.4.

Whether or not the Trustees interpretation of the statute ultimately would be borne out, there certainly was a substantial basis upon which they could assert the claims threatened. The fact that the Trustees owed the highest fiduciary duty to the bondholders further negates any suggestion of bad faith on the part of the trustees in threatening litigation for they were obligated to act to protect the interests of the bondholders. In addition, the claims of the bondholders were not insignificant as compared to their demands and the underlying situation. UV was about to make a liquidating distribution in the amount of approximately $274,000,000, while the bondholders were owed over 100 million dollars. This clearly posed a serious threat to the position of the bondholders and the Trustees were entitled to resort to legal process to insure that UV would in fact retain sufficient funds to repay them.

Sharon nevertheless claims that the Trustees knew that UV had planned to keep sufficient funds available for the repayment of its debts. The evidence presented at trial simply did not bear this out. Rather, the evidence showed that the trustee banks were concerned about the position of

the bondholders upon hearing about the proposed distribution and had inquired of UV as to its plans with respect to its public debt. These inquiries were unavailing, however, and UV's response, if one was given at all, was the mere statement that it would provide for its debt. In view of the fiduciary position of the trustees this clearly was an inadequate response. Furthermore, the evidence showed that UV was represented by two law firms at the April meeting and that its President, Edwin Jacobson signed the document only after conferring with Martin Horwitz, UV's Chief Executive Officer, and counsel. Thus, UV chose to sign the agreement in order to avoid the inconvenience of delaying the distribution while the bondholders sought adjudication of their rights in court. Merely because subsequent events have made it desirable for UV and Sharon to avoid the obligations of this agreement does not render the agreement coercive on the date on which it was executed.

In addition, "under New York law, a contract entered into under duress is generally considered not void, but voidable, and one who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it." *Scientific Holding Co. v. Plessey Inc.*, 510 F.2d 15 (1974) (citations omitted); *see, e. g., Bethlehem Steel Corp. v. Solow*, 63 App.Div.2d 292, 405 N.Y.S.2d 80 (1st Dep't 1978); *Levine v. Levy*, 285 App.Div. 848, 136 N.Y. S.2d 695 (4th Dep't) (per curiam), *appeal denied*, 285 App.Div. 1011, 139 N.Y.S.2d 297 (1955); *Port Chester Electrical Construction Corp. v. Hastings*, 284 App.Div. 966, 134 N.Y.S.2d 656 (2d Dep't 1954); 13 *Williston on Contracts* § 1624 (1970). This UV did not do. From the date on which the agreement was signed until at least November, 1979, UV complied with the April Agreement to the extent that it established the $155,000,000 Fund and presented a proposal to the trustees within the ninety day period required by the agreement. At no time during the more than six month period between the creation of the April Document and UV's sale of assets to Sharon did UV disaffirm the agreement or seek to have it set aside.

Thus, Sharon has failed completely to establish a *prima facie* case of coercion and judgment as a matter of law is rendered in favor of Chase, Manufacturers, the Intervenors and Union Planters on this claim.

## THE FAILURE OF CONSIDERATION CLAIM

■ Sharon's next claim is that the April Document is unenforceable against Sharon and UV because there was a lack of consideration flowing to UV. Under New York law, forbearance to assert a colorable legal claim constitutes sufficient consideration to support a contract so long as the promise of forbearance is absolute and for a definite time. *See Strong v. Sheffield*, 144 N.Y. 392, 39 N.E. 330 (1894); *White v. Hoyt*, 73 N.Y. 505 (1878); *Hyde v. Lipiec*, 12 Misc.2d 107, 173 N.Y.S.2d 901 (Sup.Ct. Erie County 1958).

In this case, I already have determined that there was a substantial basis in law upon which the trustees could assert their claims for injunctive relief and that their claims were made in good faith. Therefore, the only question is whether the promise of forebearance was absolute and for a definite time.

■ The April Document states that "this Agreement has been entered into by the parties ... for good and valuable consideration receipt of which is hereby acknowledged." Joint Ex. 21. Nevertheless, the understanding of the parties with respect to what this consideration was is not set forth in the Document. Therefore, in order to ascertain the full and complete understanding of the parties with respect to consideration, it is necessary to look to extrinsic evidence of their intent. *See generally* J. Calamari and J. Perillo, *The Law of Contracts* § 3–2, p. 99. The most satisfactory evidence on this issue is agreed finding of fact No. 16. It states:

The April Document states that UV and the signatory Indenture Trustees entered into the April Document in exchange for good and valuable considera-

tion, and in executing the April Document the signatory Indenture Trustees agreed not to seek a court injunction against the $18 per share distribution of April 30, 1979.

Based upon the foregoing, the only conclusion that can be reached is that the trustees agreed to forbear from suing to block the April 30th liquidating distribution, a lawsuit which they clearly were entitled to institute. This agreed for forbearance enabled UV to proceed with the distribution, on April 30, 1979. There is no question that UV took advantage of this right. Consequently, I find as a matter of law that there was valid consideration flowing to UV under the April Agreement.

### THE EXPIRATION OF THE APRIL AGREEMENT CLAIM

Sharon's next claim is that even if the April Document was at one time valid, it no longer has any force and effect and is unenforceable against Sharon or UV. According to Sharon, when it purchased all the assets UV had on November 26, 1979 and assumed its obligations, including its obligations under the Indentures and the Lease Guaranties, the April Document expired and became inapplicable, because its provisions never were intended to apply to the situation in which "all or substantially all" of UV's assets were purchased by a single corporation that was willing and able to pay off UV's public indebtedness.

I find this claim untenable for the reason that the April Document specifically limits the circumstances in which the Agreement could be terminated by UV. The April Document provides:

This Agreement may be terminated by [UV] and be of no further force and effect upon written notice by [UV] to the Corporate Trustees given at the time of the earlier to occur of the following: (i) the date on which the Plan of Liquidation and Dissolution is abandoned or terminated, provided the Company shall not be in default on such date under any of the above-described Indentures; and (ii) the date on which payment of all the Public

Indebtedness shall have been made and all of the above-described Indentures shall have been satisfied and discharged.

Although it is true that at the time UV commenced liquidation, it was not contemplated that any single purchaser would or could be found who would buy all or substantially all of UV's assets and assume UV's liabilities and obligations, plaintiff has failed to present evidence from which it can be inferred that the sale of "all" of UV's assets to another corporation while it was still in liquidation would alter the requirements of the agreement. The primary concern of the trustees in seeking the agreement was to insure that UV would retain sufficient capital to pay for its public debt in the event that it liquidated. This is evidenced by the fact that the only other provision for termination of the Agreement other than payment was abandonment of the liquidation. Because UV has in fact liquidated, it is irrelevant that another corporation was willing to assume UV's public debts.

### THE INDENTURE CLAIMS

Sharon claims that it has purchased "all or substantially all" the property of UV and has fulfilled all requirements with respect to Sharon's assumption of UV's obligations under the Indentures, including delivery of proper Supplemental Indentures to the trustee banks. Sharon contends that it therefore was and is entitled to be recognized as a successor obligor under the Indentures, that Chase and Manufacturers have wrongfully refused to execute the tendered Supplemental Indentures, and have improperly issued notices of default and seek immediate payment of the debentures. Essentially the same claims are set forth with respect to the Lease Guaranties.

Chase, Manufacturers, the Intervenors and Union Planters contend that Sharon did not purchase all or substantially all of the property of UV. The resolution of this issue turns on a determination of the date that should be utilized for measuring UV's assets. The banks and the Intervenors argue that the date of measurement should be

the date on which UV commenced its liquidation, March 26, 1979. Sharon, on the other hand, contends that the measuring date should be the date of its purchase of UV's assets, November 26, 1979.

In an opinion dated September 3, 1980, this Court found that Sharon had raised genuine issues of fact as to the meaning of the disputed language of the Indentures and the intent of the parties with respect to its interpretation. Consequently, I held that Sharon had a right to present extrinsic evidence to aid in interpreting the provisions.

The evidence presented on Sharon's direct case demonstrated that the meaning of this language simply was not discussed when the terms of the various indentures were being negotiated. *See, e.g.,* Tr. at 235–36. Rather, they were boilerplate provisions that are universally included in the Indentures. *See, e.g.,* Tr. at 1093–95. Thus, there has been no evidence as to the parties' intent in incorporating these provisions in the Indentures.

Sharon, however, has come forward with evidence of custom and usage as the meaning normally accorded these terms in the financial community. According to Sharon's experts George D. Gibson and Graham Humes, the custom and usage with respect to the time at which the assets of a corporation are measured under the "all or substantially all" provision of an indenture is the date of purchase. Tr. at 1089, 1127. Nevertheless, neither expert was aware of a situation involving the same characteristics and sequence of events as those involved in the UV liquidation. Tr. at 1109–10, 1153.

■ I find that Sharon has failed to establish a *prima facie* case with respect to its claim that it is entitled to be recognized as a successor obligor under the Indentures. Sharon's evidence as to custom and usage simply does not support its claim for the

reason that there is no custom and usage with respect to the meaning of "all or substantially all" the property of a liquidating corporation with public debt that has sold major assets and then sold its remaining assets to another corporation which seeks to become a successor obligor.

■ Because of the dearth of extrinsic evidence bearing on the interpretation of the contract term in issue, I find that no question has been presented and the issue must be decided as a matter of law. *See O'Brien v. Grumman Corp.,* 475 F.Supp. 284 (S.D.N.Y.1979). *See generally Meyers v. Selznick Corp.,* 373 F.2d 218 (2d Cir. 1966). Furthermore, in view of the boilerplate character of the provision, I find that this is a particularly appropriate instance in which to rule as a matter of law. Indeed, "there is a significant likelihood . . . that different juries, construing identical indentures in an attempt to derive 'the intent of the parties would reach different conclusions. This would . . . be anomalous, since the principal goal of using boilerplate language in such contracts is that there be uniform construction of those provisions." *Broad v. Rockwell International Co.,* 642 F.2d 929, at 947, slip op. at 6136 n.20 (5th Cir. April 17, 1981) (en banc).

"[What particular language of a contract means . . . is to be answered in terms of what the parties were intending to guard against or to insure." *B.S.F. Co. v. Philadelphia National Bank,* 42 Del.Ch. 106, 204 A.2d 746, 750 (Del.Sup.1964); *see Cromwell Towers Redevelopment Co. v. Yonkers,* 41 N.Y.2d 1, 359 N.E.2d 333, 390 N.Y.S.2d 822 (1976).[3]

The American Bar Foundation *Commentaries on Indentures* (1971) make clear that the purpose of successor corporation provisions is to insure that the "financial characteristics and repayment potential on which the lender relied" in investing in the debt

---

3. All of the indentures in this case were to be construed under New York law except for the City of Port Huron and County of Itawamba indentures which were to be construed under the law of Michigan and Mississippi, respectively. Since neither Michigan nor Mississippi law has been brought to the attention of the court by the parties, it will be assumed that they are the same as New York law. The Court therefore will apply New York law as well as general principles of contract law in construing the Indentures in question.

obligations of a corporation are not altered in an adverse manner. *Commentaries* at 290–91; Tr. at 1096–97. Thus, "transfer of the assets of the obligor substantially as an entirety is ... basic" to protecting the investment of debentureholders. *Commentaries* at p. 423; Tr. at 1098–1100.

Sharon's contention that UV's assets should be measured as of the date of sale, November 26, 1979, must be evaluated in light of the ramifications of the entire series of transactions and the underlying purpose of the successor corporation provisions as discussed above. When viewed in this manner, Sharon's suggested approach cannot be sustained. Carried to its logical conclusion, this approach would enable the final purchaser of the assets of a corporation engaged in a plan of liquidation to claim that it is the successor corporation because it purchased all the assets possessed by the selling corporation on the date of sale, regardless of how infinitesimal those assets were as compared to the total assets of the corporation. Such a result clearly would leave the bondholders of a corporation without any protection, thereby defeating the purpose of the successor corporation provisions.

■ Furthermore, it is clear in this case that the sale of UV's assets to Sharon was part of its overall plan of liquidation. Indeed, there is no evidence that separate shareholder approval for this sale of assets to Sharon was sought or obtained by UV. *See* 13A Me.Rev.Stat. § 1003. Rather, the sale was carried out pursuant to the shareholders' approval of the Liquidation Plan on March 26, 1979. Tr. at 404–05, 768. Thus, UV's assets for the purpose of determining whether it sold "all or substantially all" of its property to Sharon must be measured from the date its Liquidation Plan received shareholder approval, March 26, 1979. *See* 13A Me.Rev.Stat. § 1106. *See generally Helvering v. Elkhorn Coal Co.*, 95 F.2d 732 (4th Cir.), *aff'd on rehearing*, 95 F.2d 737 (4th Cir. 1937), *cert. denied*, 305 U.S. 605, 59 S.Ct. 65, 83 L.Ed. 384 (1938).

There has been no testimony concerning the value of UV's assets on March 26, 1979. Rather, testimony concerning the sales price of UV's other assets sold pursuant to its Liquidation Plan has been introduced and the total amount realized from these sales has been contrasted with the amount realized from the sale to Sharon.

■ UV realized a total of $480,000,000 on its sale of Federal and its oil and gas properties and UV received an amount slightly in excess of $500,000,000 on its sale to Sharon. The amount realized on the sale to Sharon thus constituted approximately 50 or 51% of the total amount realized from all three sales. This is insufficient to render the sale to Sharon a sale of "all or substantially all" of UV's assets."

Thus, Sharon has failed to sustain its claims with respect to the Supplemental Indentures and I find as a matter of law, that it is not entitled to be recognized as successor obligor under the Indentures or Lease Guaranties.

## THE ANTITRUST CLAIMS

Sharon's final claim is that the banks and the Intervenors have been engaged in unlawful agreements, combinations and conspiracies in restraint of interstate trade and commerce in the provision of credit, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. This claim is founded on the following premises: (1) that UV was paying a price of 5⅜%, 8⅛%, and 9¼% on the respective debentures and a price of 6¼% on the Lease Guaranties; (2) that these prices were considerably lower than the then prevailing market price for credit of this type; and (3) that the banks unlawfully agreed to take and have jointly taken steps to raise the price of money loaned to UV and make the terms and conditions of the loans more favorable to the trustees and the bondholders.

Sharon contends that the conduct of the banks in attempting to block the April 30, 1979 liquidating distribution, signing the April Document, refusing to execute Supplemental Indentures, declaring defaults under the Indentures and refusing to per-

mit withdrawals from the $155,000,000 Fund, individually and in combination constitute unlawful restraints of trade.

Sharon's proof at trial showed that after UV announced its plans to liquidate, sell Reliance and make a liquidating distribution, Chase, U.S. Trust, and Manufacturers first individually inquired of UV how it planned to provide for its public debt. After receiving what they felt were only the most general and unsatisfactory responses, representatives of the banks met or conversed on several occasions to discuss their positions and how they could best protect the rights of the bondholders. As a result of these discussions, the banks decided to request a meeting with UV. This meeting was scheduled for the afternoon of April 26, 1979.

On the morning of April 26th, representatives of Chase, Manufacturers and U.S. Trust met to discuss their respective positions. Chase was then in the process of drafting a document which could be used as a basis for agreement with UV as to the manner in which it would provide for its public debt. If some agreement could not be reached, Chase planned to obtain an injunction to block the distribution. U.S. Trust was undecided about whether it would go along with the proposed plan, and Manufacturers was reluctant to join in the plan. Tr. at 718. The latter, therefore, was preparing its own form of agreement to use as a basis for negotiating with UV. The general course of action planned by the Banks for the afternoon meeting with UV "was to explain to [UV] that one or more . . . trustees were prepared to enjoin the distribution or in the alternative, agreement in writing had to be worked out promptly as to how the various debt issues would be treated." Tr. at 720.

At the meeting with UV, a copy of Chase's plan for satisfying the debt was proffered to UV and Horace Robinson, counsel for Chase, set forth the common concerns of the three trustee banks with respect to fulfilling their fiduciary obligations to holders of UV's public debt. Robinson also stated that because of these concerns, the Trustees were prepared to go to Court to enjoin the planned liquidating distribution if agreement could not be reached on the question of providing for the indebtedness. UV responded with "vague assurances that there was sufficient money around to pay off the debt." During this stage of the meeting, Manufacturers proffered a separate proposal to UV.

UV representatives then left the meeting, caucused and returned with a proposal for the set aside of funds. The representatives of the Banks then caucused to determine how much money had to be set aside and to discuss the possibility of recommending to UV that it come up with a proposal for satisfying its debt. When the meeting reconvened, UV and the banks continued negotiating and agreed that $155,000,000 would be set aside. Upon UV's suggestion it was agreed that this fund was to be used to cover all its public indebtedness. The parties further agreed that UV would come forward with a proposal for satisfaction and discharge of the debt from the $155,000,000 Fund within ninety days. Tr. 746–47. The details of the agreement were worked out later that day and into early the next morning.

At the end of the ninety-day period, on July 26, 1979, UV met separately with representatives of each of the three banks and presented proposals for repaying the debt. Each of the banks told UV that it would consider the proposal presented to it.

Following the July 26, 1979 meeting, representatives of U.S. Trust, Chase and Manufacturers met to exchange ideas on how best to approach what they considered to be a "very difficult" situation, Tr. at 974, and to insure that the bondholders whom they represented were being treated equitably as compared to holders of bonds issued under the other indentures.

The plan proposed to U.S. Trust was for an advanced refunding or defeasance of the debt. In the opinion of counsel for U.S.

Trust, UV's proposal plan was desirable in that it would improve the quality of the notes in the market in view of the high interest rates prevailing in the summer of 1979. By early August, 1979, both Chase and Manufacturers had rejected UV's proposal with respect to one of its indentures and Manufacturers was undecided about the response it would make.

From early August 1979 through the beginning of November 1979, there was intermittent contact among the trustees and between the trustees and UV concerning UV's proposals. In November 1979, it became evident that Sharon had decided to purchase UV's assets and assume UV's liabilities. Sharon requested that the Banks appear at the closing of the sale to UV for the purpose of executing Supplemental Indentures. However, none of the banks executed Supplemental Indentures on that date or on December 6, 1979 when Sharon again tendered them. On December 24, 1979, the banks issued default notices and subsequently commenced suits against Sharon.

## APPLICATION OF THE SHERMAN ACT

■ Section 1 of the Sherman Act provides that "[e]very contract, combination . . . or conspiracy in restraint of trade or commerce among the several states . . . is declared to be illegal." 15 U.S.C. § 1. In a civil suit for damages, a plaintiff must establish that two or more parties have entered into a contract, combination or conspiracy that unreasonably restrains trade causing injury to his business or property. *See generally Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

Sharon contends that the above-described conduct of the banks violated section 1 of the Sherman Act in that it constituted an attempt to fix the price of UV's and Sharon's credit and amounted to a group boycott. In analyzing Sharon's claims, it is necessary to first determine whether Sharon has established a "mutual commitment to an anticompetitive course" among the banks.

It is well settled that "explicit agreement is not a necessary part of a Sherman Act conspiracy," especially where "joint and collaborative action [is] pervasive in the initiation, execution and fulfillment of [a] plan." *United States v. General Motors Corp.*, 384 U.S. 127, 142, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966). While Sharon may have presented evidence that the Banks had engaged in collaborative action by exchanging information and ideas on the UV situation, there is no evidence that their commitment was to an anti-competitive course of conduct. Indeed, the evidence shows that the banks were not engaged in competition with respect to an obligor's obligations under outstanding indentures. Nevertheless, each of Sharon's claims will be examined to determine whether a *prima facie* case has been presented.

■ In order to establish a price-fixing violation, a plaintiff must show that the agreement of the defendants had the purpose or effect of fixing prices. *See Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In this case, it simply cannot be said that the purpose of the banks conduct was to tamper with the price of credit offered to UV and Sharon. Rather, the clear and overriding purpose of the Banks' conduct was to secure the repayment of public debts which they believed were due and owing as a result of UV's liquidation and its having made a liquidating distribution.

An examination of the effect of the banks' conduct similarly fails to support a claim of price-fixing. The price paid by UV and Sharon for credit under the Indentures was fixed at the time the Indentures were issued. The banks merely were attempting to insure that the credit previously extended to UV would be repaid. Thus, this case does not involve an issue as to the extension of credit to UV and Sharon. Upon the evidence presented, it must be concluded as

a matter of law that the banks were not engaged in price-fixing. *See generally Falstaff Brewing Co. v. New York Life Insurance Co.*, 513 F.Supp. 289, at 293 (N.D.Cal. 1978).

The next issue that must be addressed is whether the banks' conduct constituted an illegal group boycott under the Sherman Act. "Group boycotts or concerted refusals to deal with other traders, have long been held to" constitute per se violations of the act. They have not been saved by allegations that they were reasonable in the specific circumstances...." *Klor's Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959); *see St. Paul Fire and Marine Insurance Co. v. Barry*, 438 U.S. 531, 543, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978); *United States v. General Motors Corp.*, 384 U.S. 127, 145–46, 86 S.Ct. 1321, 1330–31, 16 L.Ed.2d 415 (1966).

■ I find that with respect to events occurring prior to December 24, 1979, the banks' conduct did not constitute a concerted refusal to trade or refusal to trade except on a limited basis. Indeed, the evidence at trial demonstrated that throughout the spring, summer and fall of 1979, each of the banks were desirous of negotiating with UV and maintained fairly independent positions with respect to the terms which would be acceptable to each. Thus, U.S. Trust, prior to the April 26, 1979 meeting had not decided upon the course of action it would follow and at the meeting, Manufacturers proffered a proposal different from that of Chase. When UV presented the trustees with proposals for repaying the debt in the summer of 1979, the banks again had different reactions to UV's plans and pursued negotiations of differing depth with respect to arriving at final agreement. In addition, some if not all of the three banks attended the November 26, 1979 closing with the ability to execute Supplemental Indentures if satisfied with the documentation and other factors relating to Sharon's assumption of UV's obligations under the Indentures. Thus, the foregoing

evidence plainly does not establish Sharon's claims with respect to a group boycott.

■ The banks' conduct with respect to the issuance of default notices on December 24, 1979 and the commencement of lawsuits at various times between December 1979 and July 1980 as a matter of law cannot be found to restrain trade because invocation of judicial processes for the resolution of business and economic interests does not violate the anti-trust laws unless the lawsuits are baseless and instituted to harass. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972). As previously discussed, the lawsuits commenced by the banks were not of this character. Thus, Sharon has failed to establish its claim of a group boycott.

## CONCLUSION

For the foregoing reasons, I find that the evidence with respect to each of Sharon's eight causes of action is not "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Lopez v. A/S D/S Svendborg*, 581 F.2d 319, 321 (1978). Sharon's claims against the Intervenors and Union Planters must also be dismissed, because based upon agency principles, they must fall with the claims against their alleged principals. Therefore, I grant the motions of Chase, Manufacturers, the Intervenors and Union Planters as a matter of law and dismiss the complaint in its entirety.

SO ORDERED.